(Slip Opinion)          OCTOBER TERM, 2007          1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## UNITED STATES *v.* SANTOS ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

No. 06–1005.   Argued October 3, 2007—Decided June 2, 2008

In an illegal lottery run by respondent Santos, runners took commissions from the bets they gathered, and some of the rest of the money was paid as salary to respondent Diaz and other collectors and to the winning gamblers.  Based on these payments to runners, collectors, and winners, Santos was convicted of, *inter alia,* violating the federal money-laundering statute, 18 U. S. C. §1956, which prohibits the use of the "proceeds" of criminal activities for various purposes, including engaging in, and conspiring to engage in, transactions intended to promote the carrying on of unlawful activity, §1956(a)(1)(A)(i) and §1956(h).  Based on his receipt of salary, Diaz pleaded guilty to conspiracy to launder money.  The Seventh Circuit affirmed the convictions.  On collateral review, the District Court ruled that, under intervening Circuit precedent interpreting the word "proceeds" in the federal money-laundering statute, §1956(a)(1)(A)(i) applies only to transactions involving criminal profits, not criminal receipts.  Finding no evidence that the transactions on which respondents' money-laundering convictions were based involved lottery profits, the court vacated those convictions.  The Seventh Circuit affirmed.

*Held:* The judgment is affirmed.

461 F. 3d 886, affirmed.

JUSTICE SCALIA, joined by JUSTICE SOUTER, JUSTICE THOMAS, and JUSTICE GINSBURG, concluded in Parts I–III and V that the term "proceeds" in §1956(a)(1) means "profits," not "receipts." Pp. 3–14, 16–17.

(a) The rule of lenity dictates adoption of the "profits" reading.  The statute nowhere defines "proceeds."  An undefined term is generally given its ordinary meaning. *Asgrow Seed Co.* v. *Winterboer*, 513 U. S. 179, 187.  However, dictionaries and the Federal Criminal Code

sometimes define "proceeds" to mean "receipts" and sometimes "profits." Moreover, the many provisions in the federal money-laundering statute that use the word "proceeds" make sense under either definition. The rule of lenity therefore requires the statute to be interpreted in favor of defendants, and the "profits" definition of "proceeds" is always more defendant-friendly than the "receipts" definition. Pp. 3–6.

(b) The Government's contention that the "profits" interpretation fails to give the money-laundering statute its intended scope begs the question; the Government's contention that the "profits" interpretation hinders effective enforcement of the law is exaggerated. Neither suffices to overcome the rule of lenity. Pp. 6–14.

(c) None of the transactions on which respondents' money-laundering convictions were based can fairly be characterized as involving the lottery's profits. Pp. 16–17.

JUSTICE SCALIA, joined by JUSTICE SOUTER and JUSTICE GINSBURG, concluded in Part IV that JUSTICE STEVENS' position that "proceeds" should be interpreted to mean profits for some predicate crimes, "receipts" for others, is contrary to this Court's precedents holding that judges cannot give the same statutory text different meanings in different cases, see *Clark* v. *Martinez*, 543 U. S. 371. Pp. 14–16.

JUSTICE STEVENS concluded that revenue a gambling business uses to pay essential operating expenses is not "proceeds" under 18 U. S. C. §1956. When, as here, Congress fails to define potentially ambiguous statutory terms, it effectively delegates the task to federal judges. See *Commissioner* v. *Fink*, 483 U. S. 89, 104. Because Congress could have required that "proceeds" have one meaning when referring to some of the specified unlawful activities listed in §1956(c)(7) and a different meaning when referring to others, judges filling statutory gaps may also do so, as long as they are conscientiously endeavoring to carry out Congress' intent. Section 1956's legislative history makes clear that "proceeds" includes gross revenues from the sale of contraband and the operation of organized crime syndicates involving such sales, but sheds no light on how to identify the proceeds of an unlicensed stand-alone gambling venture. Furthermore, the consequences of applying a "gross receipts" definition of "proceeds" to respondents are so perverse that Congress could not have contemplated them: Allowing the Government to treat the mere payment of an illegal gambling business' operating expenses as a separate offense is in practical effect tantamount to double jeopardy, which is particularly unfair in this case because the penalties for money laundering are substantially more severe than those for the underlying offense of operating a gambling business. Accordingly, the rule of lenity may weigh in the determination, and in that respect

Syllabus

the plurality's opinion is persuasive. Pp. 1–6.

SCALIA, J., announced the judgment of the Court and delivered an opinion, in which SOUTER and GINSBURG, JJ., joined, and in which THOMAS, J., joined as to all but Part IV. STEVENS, J., filed an opinion concurring in the judgment. BREYER, J., filed a dissenting opinion. ALITO, J., filed a dissenting opinion, in which ROBERTS, C. J., and KENNEDY and BREYER, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

---

No. 06–1005

---

## UNITED STATES, PETITIONER *v.* EFRAIN SANTOS AND BENEDICTO DIAZ

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

[June 2, 2008]

JUSTICE SCALIA announced the judgment of the Court and delivered an opinion, in which JUSTICE SOUTER and JUSTICE GINSBURG join, and in which JUSTICE THOMAS joins as to all but Part IV.

We consider whether the term "proceeds" in the federal money-laundering statute, 18 U. S. C. §1956(a)(1), means "receipts" or "profits."

I

From the 1970's until 1994, respondent Santos operated a lottery in Indiana that was illegal under state law. See Ind. Code §35–45–5–3 (West 2004). Santos employed a number of helpers to run the lottery. At bars and restaurants, Santos's runners gathered bets from gamblers, kept a portion of the bets (between 15% and 25%) as their commissions, and delivered the rest to Santos's collectors. Collectors, one of whom was respondent Diaz, then delivered the money to Santos, who used some of it to pay the salaries of collectors (including Diaz) and to pay the winners.

These payments to runners, collectors, and winners formed the basis of a 10-count indictment filed in the United States District Court for the Northern District of

Indiana, naming Santos, Diaz, and 11 others. A jury found Santos guilty of one count of conspiracy to run an illegal gambling business (§371), one count of running an illegal gambling business (§1955), one count of conspiracy to launder money (§1956(a)(1)(A)(i) and §1956(h)), and two counts of money laundering (§1956(a)(1)(A)(i)). The court sentenced Santos to 60 months of imprisonment on the two gambling counts and to 210 months of imprisonment on the three money-laundering counts. Diaz pleaded guilty to conspiracy to launder money, and the District Court sentenced him to 108 months of imprisonment. The Court of Appeals affirmed the convictions and sentences. *United States* v. *Febus*, 218 F. 3d 784 (CA7 2000). We declined to review the case. 531 U. S. 1021 (2000).

Thereafter, respondents filed motions under 28 U. S. C. §2255, collaterally attacking their convictions and sentences. The District Court rejected all of their claims but one, a challenge to their money-laundering convictions based on the Seventh Circuit's subsequent decision in *United States* v. *Scialabba*, 282 F. 3d 475 (2002), which held that the federal money-laundering statute's prohibition of transactions involving criminal "proceeds" applies only to transactions involving criminal profits, not criminal receipts. *Id.,* at 478. Applying that holding to respondents' cases, the District Court found no evidence that the transactions on which the money-laundering convictions were based (Santos's payments to runners, winners, and collectors and Diaz's receipt of payment for his collection services) involved profits, as opposed to receipts, of the illegal lottery, and accordingly vacated the money-laundering convictions. The Court of Appeals affirmed, rejecting the Government's contention that *Scialabba* was wrong and should be overruled. 461 F. 3d 886 (CA7 2006). We granted certiorari. 550 U. S. ___ (2007).

## II

The federal money-laundering statute prohibits a num-ber of activities involving criminal "proceeds." Most rele-vant to this case is 18 U. S. C. §1956(a)(1)(A)(i), which criminalizes transactions to promote criminal activity.[1] This provision uses the term "proceeds" in describing two elements of the offense: the Government must prove that a charged transaction "in fact involve[d] the proceeds of specified unlawful activity" (the proceeds element), and it also must prove that a defendant knew "that the property involved in" the charged transaction "represent[ed] the proceeds of some form of unlawful activity" (the knowledge element). §1956(a)(1).

The federal money-laundering statute does not define "proceeds." When a term is undefined, we give it its ordi-nary meaning. *Asgrow Seed Co.* v. *Winterboer*, 513 U. S. 179, 187 (1995). "Proceeds" can mean either "receipts" or "profits." Both meanings are accepted, and have long been accepted, in ordinary usage. See, *e.g.,* 12 Oxford English Dictionary 544 (2d ed. 1989); Random House Dictionary of the English Language 1542 (2d ed. 1987); Webster's New International Dictionary 1972 (2d ed. 1957) (hereinafter Webster's 2d). The Government contends that dictionaries generally prefer the "receipts" definition over the "profits"

—————

[1] Section 1956(a)(1) reads as follows: "Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . (A)(i) with the intent to promote the carrying on of specified unlawful activity . . . shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the trans-action, whichever is greater, or imprisonment for not more than twenty years, or both."

Respondents were also convicted of conspiring to launder money under §1956(h). Because the Government has not argued that respon-dents' conspiracy convictions could stand if "proceeds" meant "profits," see 461 F. 3d 866, 889 (CA7 2006), we do not address that possibility.

definition, but any preference is too slight for us to con-
clude that "receipts" is the *primary* meaning of "proceeds."

"Proceeds," moreover, has not acquired a common mean-
ing in the provisions of the Federal Criminal Code. Most
leave the term undefined. See, *e.g.,* 18 U. S. C. §1963; 21
U. S. C. §853. Recognizing the word's inherent ambiguity,
Congress has defined "proceeds" in various criminal provi-
sions, but sometimes has defined it to mean "receipts" and
sometimes "profits." Compare 18 U. S. C. §2339C(e)(3)
(2000 ed., Supp. V) (receipts), §981(a)(2)(A) (2000 ed.)
(same), with §981(a)(2)(B) (profits).

Since context gives meaning, we cannot say the money-
laundering statute is truly ambiguous until we consider
"proceeds" not in isolation but as it is used in the federal
money-laundering statute. See *United Sav. Assn. of Tex.*
v. *Timbers of Inwood Forest Associates, Ltd.*, 484 U. S.
365, 371 (1988). The word appears repeatedly throughout
the statute, but all of those appearances leave the ambigu-
ity intact. Section 1956(a)(1) itself, for instance, makes
sense under either definition: one can engage in a finan-
cial transaction with either receipts or profits of a crime;
one can intend to promote the carrying on of a crime with
either its receipts or its profits; and one can try to conceal
the nature, location, etc., of either receipts or profits. The
same is true of all the other provisions of this legislation in
which the term "proceeds" is used. They make sense
under either definition. See, for example, §1956(a)(2)(B),
which speaks of "proceeds" represented by a "monetary
instrument or funds."

JUSTICE ALITO's dissent (the principal dissent) makes
much of the fact that 14 States that use *and define* the
word "proceeds" in their money-laundering statutes,[2] the

---

[2] The majority of States with money-laundering laws, in fact, use "pro-
ceeds" *without defining it.* See Colo. Rev. Stat. Ann. §18–18–408 (2007);
Fla. Stat. §896.101 (2006); Ga. Code Ann. §§7–1–911, 7–1–915 (2004);

Model Money Laundering Act, and an international treaty on the subject, all define the term to include gross receipts. See *post*, at 3–5. We do not think this evidence shows that the drafters of the federal money-laundering statute used "proceeds" as a term of art for "receipts." Most of the state laws cited by the dissent, the Model Act, and the treaty postdate the 1986 federal money-laundering statute by several years, so Congress was not acting against the backdrop of those definitions when it enacted the federal statute. If anything, they show that "proceeds" is ambiguous and that others who believed that money-laundering statutes ought to include gross receipts sought to clarify the ambiguity that Congress created when it left the term undefined.[3]

———————

Idaho Code §18–8201 (Lexis 2004); Ill. Comp. Stat., ch. 720, §29B–1 (West 2003); Kan. Stat. Ann. §65–4142 (2002); Minn. Stat. §§609.496 to 609.497 (2006); Miss. Code Ann. §97–23–101 (2006); Mo. Rev. Stat. §574.105 (2000); Mont. Code Ann. §45–6–341 (2007); Nev. Rev. Stat. §207.195 (2007); N. Y. Penal Law Ann. §§470.00 to 470.25 (West Supp. 2008); Okla. Stat., Tit. 63, §2–503.1 (2004); Ore. Rev. Stat. §164.170 (2007); 18 Pa. Cons. Stat. §5111 (Supp. 2008); R. I. Gen. Laws §11–9.1–15 (2002); S. C. Code Ann. §44–53–475 (2002); Tenn. Code Ann. §§39–14–901 to 39–14–909 (2006). Courts in these States have not construed the term one way or the other. But cf. *State* v. *Jackson*, 124 S. W. 3d 139, 143 (Tenn. Crim. App. 2003) (linking "proceeds" with the defined term "property"). California might belong in this list, for it has a money-laundering provision in its Penal Code, in which it uses the term "proceeds" but does not define it. See Cal. Penal Code Ann. §186.10 (West 1999). But California also has a more limited money-laundering statute that uses and defines "proceeds." See Cal. Health & Safety Code Ann. §11370.9(h)(1) (West 2007). Maryland might belong on the list as well: Its general money-laundering statute defines "proceeds" simply to set a minimum value on the proceeds laundered, Md. Crim. Law Code Ann. §5–623(a)(5) (Lexis 2002) ("money or any other property with a value exceeding $10,000"), and its more limited money-laundering statute does not define the term, see §11–304.

[3] The principal dissent also suggests that Congress thought "proceeds" meant "receipts" because the House of Representatives (but not the Senate) had passed a money-laundering bill that did not use the word

Under either of the word's ordinary definitions, all provisions of the federal money-laundering statute are coherent; no provisions are redundant; and the statute is not rendered utterly absurd. From the face of the statute, there is no more reason to think that "proceeds" means "receipts" than there is to think that "proceeds" means "profits." Under a long line of our decisions, the tie must go to the defendant. The rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them. See *United States* v. *Gradwell*, 243 U. S. 476, 485 (1917); *McBoyle* v. *United States*, 283 U. S. 25, 27 (1931); *United States* v. *Bass*, 404 U. S. 336, 347–349 (1971). This venerable rule not only vindicates the fundamental principle that no citizen should be held accountable for a violation of a statute whose commands are uncertain, or subjected to punishment that is not clearly prescribed. It also places the weight of inertia upon the party that can best induce Congress to speak more clearly and keeps courts from making criminal law in Congress's stead. Because the "profits" definition of "proceeds" is always more defendant-friendly than the "receipts" definition, the rule of lenity dictates that it should be adopted.

## III

Stopping short of calling the "profits" interpretation absurd, the Government contends that the interpretation should nonetheless be rejected because it fails to give the

—————

"proceeds" but rather used and defined a term ("criminally derived property") that, perhaps, included receipts. See *post*, at 5, n. 5. Putting aside the question whether resort to legislative history is ever appropriate when interpreting a criminal statute, compare *United States* v. *R. L. C.*, 503 U. S. 291, 306, n. 6 (1992), with *id.*, at 307 (SCALIA, J., concurring in part and concurring in judgment), that bit of it is totally unenlightening because we do not know why the earlier House terminology was rejected—because "proceeds" captured the same meaning, or because "proceeds" carried a narrower meaning?

federal money-laundering statute its proper scope and because it hinders effective enforcement of the law. Neither contention overcomes the rule of lenity.

## A

According to the Government, if we do not read "proceeds" to mean "receipts," we will disserve the purpose of the federal money-laundering statute, which is, the Government says, to penalize criminals who conceal or promote their illegal activities. On the Government's view, "[t]he gross receipts of a crime accurately reflect the scale of the criminal activity, because the illegal activity generated all of the funds." Brief for United States 21; see also *post*, at 5–7 (ALITO, J., dissenting).

When interpreting a criminal statute, we do not play the part of a mind reader. In our seminal rule-of-lenity decision, Chief Justice Marshall rejected the impulse to speculate regarding a dubious congressional intent. "[P]robability is not a guide which a court, in construing a penal statute, can safely take." *United States* v. *Wiltberger*, 5 Wheat. 76, 105 (1820). And Justice Frankfurter, writing for the Court in another case, said the following: "When Congress leaves to the Judiciary the task of imputing to Congress an undeclared will, the ambiguity should be resolved in favor of lenity." *Bell* v. *United States*, 349 U. S. 81, 83 (1955).

The statutory purpose advanced by the Government to construe "proceeds" is a textbook example of begging the question. To be sure, if "proceeds" meant "receipts," one could say that the statute was aimed at the dangers of concealment and promotion. But whether "proceeds" means "receipts" is the very issue in the case. If "proceeds" means "profits," one could say that the statute is aimed at the distinctive danger that arises from leaving in criminal hands the yield of a crime. A rational Congress could surely have decided that the risk of leveraging one

criminal activity into the next poses a greater threat to society than the mere payment of crime-related expenses and justifies the money-laundering statute's harsh penalties.

If we accepted the Government's invitation to speculate about congressional purpose, we would also have to confront and explain the strange consequence of the "receipts" interpretation, which respondents have described as a "merger problem." See, *e.g.,* Brief for Respondent Diaz 34. If "proceeds" meant "receipts," nearly every violation of the illegal-lottery statute would also be a violation of the money-laundering statute, because paying a winning bettor is a transaction involving receipts that the defendant intends to promote the carrying on of the lottery. Since few lotteries, if any, will not pay their winners, the statute criminalizing illegal lotteries, 18 U. S. C. §1955, would "merge" with the money-laundering statute. Congress evidently decided that lottery operators ordinarily deserve up to 5 years of imprisonment, §1955(a), but as a result of merger they would face an additional 20 years, §1956(a)(1). Prosecutors, of course, would acquire the discretion to charge the lesser lottery offense, the greater money-laundering offense, or both—which would predictably be used to induce a plea bargain to the lesser charge.

The merger problem is not limited to lottery operators. For a host of predicate crimes, merger would depend on the manner and timing of payment for the expenses associated with the commission of the crime. Few crimes are entirely free of cost, and costs are not always paid in advance. Anyone who pays for the costs of a crime with its proceeds—for example, the felon who uses the stolen money to pay for the rented getaway car—would violate the money-laundering statute. And any wealth-acquiring crime with multiple participants would become money-laundering when the initial recipient of the wealth gives

his confederates their shares.[4]  Generally speaking, any
specified unlawful activity, an episode of which includes
transactions which are not elements of the offense and in
which a participant passes receipts on to someone else,
would merge with money laundering.  There are more than
250 predicate offenses for the money-laundering statute,
see Dept. of Justice, Bureau of Justice Statistics, M. Moti-
vans, Money Laundering Offenders 1994–2001, p. 2 (2003),
online at http://www.ojp.usdoj.gov/bjs/pub/pdf/mlo01.pdf (as
visited May 29, 2008, and available in Clerk of Court's
case file), and many foreseeably entail such transactions,
see 18 U. S. C. §1956(c)(7) (establishing as predicate of-
fenses a number of illegal trafficking and selling offenses,
the expenses of which might be paid after the illegal
transportation or sale).

    The Government suggests no explanation for why Con-
gress would have wanted a transaction that is a normal
part of a crime it had duly considered and appropriately
punished elsewhere in the Criminal Code to radically
increase the sentence for that crime.  Interpreting "pro-
ceeds" to mean "profits" eliminates the merger problem.
Transactions that normally occur during the course of
running a lottery are not identifiable uses of profits and
thus do not violate the money-laundering statute.  More
generally, a criminal who enters into a transaction paying
the expenses of his illegal activity cannot possibly violate
the money-laundering statute, because by definition prof-
its consist of what remains after expenses are paid.  De-
fraying an activity's costs with its receipts simply will not
be covered.

——————
    [4] The Solicitor General suggests that this is the case even under the
"profits" interpretation.  See Reply Brief for United States 16; see also
*post*, at 15–16 (ALITO, J., dissenting).  That is not so, because when the
"loot" comes into the hands of the later distributing felon his confeder-
ates' shares are (as to him) not profits but mere receipts subject to his
payment of expenses.

The principal dissent suggests that a solution to the merger problem may be found in giving a narrow interpretation to the "promotion prong" of the statute: A defendant might be deemed not to "promote" illegal activity "by doing those things . . . that are needed merely to keep the business running," *post*, at 18, because promotion (presumably) means doing things that will cause a business to grow. See Webster's 2d, p. 1981 (giving as one of the meanings of "promote" "[t]o contribute to the growth [or] enlargement" of something). (This argument is embraced by JUSTICE BREYER's dissent as well. See *post*, at 2.) The federal money-laundering statute, however, bars not the bare act of promotion, but engaging in certain transactions "with the intent to promote *the carrying on* of specified unlawful activity." 18 U. S. C. §1956(a)(1)(A)(i) (emphasis added). In that context the word naturally bears one of its other meanings, such as "[t]o contribute to the . . . prosperity" of something, or to "further" something. See Webster's 2d, p. 1981. Surely one promotes "the carrying on" of a gambling enterprise by merely assuring that it continues in business.[5] In any event, to believe that this "narrow" interpretation of "promote" would solve the merger problem one must share the dissent's misperception that the statute applies just to the conduct of ongoing enterprises rather than individual unlawful acts. If the predicate act is theft by an individual, it makes no sense to ask whether an expenditure was intended to "grow" the culprit's theft

--------

[5] We note in passing the peculiarity that a dissent which rejects our interpretation of "proceeds" because knowledge of profits will be difficult to prove, suggests an interpretation of "promotes" that will require proving that a particular expenditure was intended, not merely to keep a business "running," but to expand it. ("You must decide, ladies and gentlemen of the jury, whether it is true beyond a reasonable doubt that the payoff of this winning bettor was not simply motivated by a desire to bring him and other current gambling customers back, but was meant to create a reputation for reliable payoff that would attract future customers.")

business.  The merger problem thus stands as a major obstacle to the dissent's interpretation of "proceeds."

JUSTICE BREYER admits that the merger problem casts doubt on the Government's position, *post*, at 1, but believes there are "other, more legally felicitous" solutions to the problem, *post*, at 2.  He suggests that the merger problem could be solved by holding that "the money laundering offense and the underlying offense that generated the money to be laundered must be distinct in order to be separately punishable."  *Ibid.*  The insuperable difficulty with this solution is that it has no basis whatever in the words of the statute.  Even assuming (as one should not) the propriety of a judicial rewrite, why should one believe that Congress wanted courts to avoid the merger problem in that unusual fashion, rather than by adopting one of the two possible meanings of an ambiguous term?  JUSTICE BREYER pins hope on the possibility, "if the 'merger' problem is essentially a problem of fairness in sentencing," that the United States Sentencing Commission might revise its recommended sentences for money laundering.  *Post*, at 2–3.  See also principal dissent, *post*, at 17–18 (in agreement).  Even if that is a possibility, it is not a certainty.  And once again, why should one choose this chancy method of solving the problem, rather than interpret ambiguous language to avoid it?  In any event, as noted, *supra*, at 8, the merger problem affects more than just sentencing; it affects charging decisions and plea-bargaining as well.

B

The Government also argues for the "receipts" interpretation because—quite frankly—it is easier to prosecute.  Proving the proceeds and knowledge elements of the federal money-laundering offense under the "profits" interpretation will unquestionably require proof that is more difficult to obtain.  Essentially, the Government asks us to

resolve the statutory ambiguity in light of Congress's presumptive intent to facilitate money-laundering prosecutions. That position turns the rule of lenity upside-down. We interpret ambiguous criminal statutes in favor of defendants, not prosecutors.

It is true that the "profits" interpretation demands more from the Government than the "receipts" interpretation. Not so much more, however, as to render such a disposition inconceivable—as proved by the fact that Congress has imposed similar proof burdens upon the prosecution elsewhere. See 18 U. S. C. §1963(a) (criminal forfeiture provision requiring determination of "gross profits or other proceeds"); 21 U. S. C. §853(a) (same).[6] It is untrue that the added burdens "serve no discernible purpose." *Post*, at 12 (ALITO, J., dissenting). They ensure that the severe money-laundering penalties will be imposed only for the removal of profits from criminal activity, which permit the leveraging of one criminal activity into the next. See *supra*, at 7–8.

In any event, the Government exaggerates the difficulties. The "proceeds of specified unlawful activity" are the proceeds from the conduct sufficient to prove *one* predicate offense. Thus, to establish the proceeds element under the "profits" interpretation, the prosecution needs to show only that a single instance of specified unlawful activity was profitable and gave rise to the money involved in a charged transaction. And the Government, of course, can select the instances for which the profitability is clearest.

_____

[6] The principal dissent claims that these statutes do not require proof of profits because the Government could rely upon the "other proceeds" prong, which the dissent interprets to mean *all* proceeds, gross profits and everything else. See *post*, at 16. We do not normally interpret a text in a manner that makes one of its provisions superfluous. But even if we did, these provisions would still establish what the dissent believes unthinkable: that Congress could envision the Government's proving profits.

Contrary to the principal dissent's view, *post*, at 6, 11–12, the factfinder will not need to consider gains, expenses, and losses attributable to other instances of specified unlawful activity, which go to the profitability of some entire criminal enterprise. What counts is whether the receipts from the charged unlawful act exceeded the costs fairly attributable to it.[7]

When the Government charges an "enterprise" crime as the predicate offense, see, *e.g.,* 18 U. S. C. §1956(c)(7)(C), it will have to prove the profitability of only the conduct sufficient to violate the enterprise statute. That is typically defined as a "continuing series of violations," 21 U. S. C. §848(c)(2), which would presumably be satisfied by three violations, see *Richardson* v. *United States*, 526 U. S. 813, 818 (1999). Thus, the Government will have to prove the profitability of just three offenses, selecting (again) those for which profitability is clearest. And of course a prosecutor will often be able to charge the under-

---

[7] The principal dissent asks, "[H]ow long does each gambling 'instance' last?" *Post*, at 14. The answer is "as long as the Government chooses to charge." Title 18 U. S. C. §1955(a) provides that "[w]hoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined under this title or imprisoned not more than five years, or both." An illegal gambling business is an illegal gambling business during each moment of its operation, and it will be up to the Government to select that period of time for which it can most readily establish the necessary elements of the charged offenses, including (if money laundering is one of them) profitability. (To the extent this raises the possibility of the Government's making multiple violations out of one person's running of a single business, that problem arises no matter what definition of "proceeds" is adopted.) The "preposterous results" that the dissent attributes to our interpretation of "proceeds," *post*, at 14, are in fact the consequence of the Government's decision to charge Santos with conducting a gambling business over a 6-year period. Of course in the vast majority of cases, establishing the profitability of the predicate offense will not put the Government to the task of identifying the relevant period. Most criminal statutes prohibit discrete, individual acts (fraud, bank robbery) rather than the conduct of a business.

lying crimes instead of the overarching enterprise crime.

As for the knowledge element of the money-laundering offense—knowledge that the transaction involves profits of unlawful activity—that will be provable (as knowledge must almost always be proved) by circumstantial evidence. For example, someone accepting receipts from what he knows to be a long-continuing drug-dealing operation can be found to know that they include some profits. And a jury could infer from a long-running launderer-criminal relationship that the launderer knew he was hiding the criminal's profits. Moreover, the Government will be entitled to a willful blindness instruction if the professional money launderer, aware of a high probability that the laundered funds were profits, deliberately avoids learning the truth about them—as might be the case when he knows that the underlying crime is one that is rarely unprofitable.

## IV

Concurring in the judgment, JUSTICE STEVENS expresses the view that the rule of lenity applies to this case because there is no legislative history reflecting any legislator's belief about how the money-laundering statute should apply to lottery operators. See *post*, at 3, 5. The rule of lenity might not apply, he thinks, in a case involving an organized crime syndicate or the sale of contraband because the legislative history supposedly contains some views on the meaning of "proceeds" in those circumstances.[8] See *post*, at 2–3, and n. 3. In short, JUSTICE

---

[8] JUSTICE STEVENS fails to identify the legislative history to which he refers. He offers only: "As JUSTICE ALITO rightly argues, the legislative history of §1956 makes it clear that Congress intended the term 'proceeds' to include gross revenues from the sale of contraband and the operation of organized crime syndicates involving such sales." *Post*, at 2–3. Although JUSTICE ALITO, from one item of legislative history, draws an inference about the meaning of "proceeds" in all its applications (which we find dubious, see n. 3, *supra*), nowhere does he cite

STEVENS would interpret "proceeds" to mean "profits" for some predicate crimes, "receipts" for others.

JUSTICE STEVENS' position is original with him; neither the United States nor any *amicus* suggested it; it has no precedent in our cases. JUSTICE STEVENS relies on the proposition that one undefined word, repeated in different statutory provisions, can have different meanings in each provision. See *post*, at 2, and n. 2. But that is worlds apart from giving the same word, *in the same statutory provision*, different meanings *in different factual contexts*. Not only have we never engaged in such interpretive contortion; just over three years ago, in an opinion joined by JUSTICE STEVENS, we forcefully rejected it. *Clark* v. *Martinez*, 543 U. S. 371 (2005), held that the meaning of words in a statute cannot change with the statute's application. See *id.,* at 378. To hold otherwise "would render every statute a chameleon," *id.,* at 382, and "would establish within our jurisprudence . . . the dangerous principle that judges can give the same statutory text different meanings in different cases," *id.,* at 386. Precisely to avoid that result, our cases often "give a statute's ambiguous language a limiting construction called for by one of the statute's applications, even though other of the statute's applications, standing alone, would not support the same limitation. *The lowest common denominator, as it were, must govern.*" *Id.,* at 380 (emphasis added).

Our obligation to maintain the consistent meaning of words in statutory text does not disappear when the rule of lenity is involved. To the contrary, we have resolved an ambiguity in a tax statute in favor of the taxpayer in a civil case because the statute had criminal applications

————————

legislative history addressing the meaning of the word "proceeds" in cases specifically involving contraband or organized crime. Thus JUSTICE STEVENS' concurrence appears to address not only a hypothetical case, see *infra*, at 16, but even an imagined legislative history.

that triggered the rule of lenity. See *United States* v. *Thompson/Center Arms Co.*, 504 U. S. 505, 517–518, and n. 10 (1992) (plurality opinion). If anything, the rule of lenity is an additional reason to remain consistent, lest those subject to the criminal law be misled. And even if, as JUSTICE STEVENS contends, *post*, at 1, statutory ambiguity "effectively" licenses us to write a brand-new law, we cannot accept that power in a criminal case, where the law must be written by Congress. See *United States* v. *Hudson*, 7 Cranch 32, 34 (1812).

We think it appropriate to add a word concerning the *stare decisis* effect of JUSTICE STEVENS' opinion. Since his vote is necessary to our judgment, and since his opinion rests upon the narrower ground, the Court's holding is limited accordingly. See *Marks* v. *United States*, 430 U. S. 188, 193 (1977). But the narrowness of his ground consists of finding that "proceeds" means "profits" when there is no legislative history to the contrary. That is all that our judgment holds. It does not hold that the outcome is different when contrary legislative history does exist. JUSTICE STEVENS' speculations on that point address a case that is not before him, are the purest of dicta, and form no part of today's holding. Thus, as far as this particular statute is concerned, counsel remain free to argue JUSTICE STEVENS' view (and to explain why it does not overrule *Clark* v. *Martinez*, *supra*). They should be warned, however: Not only do the Justices joining this opinion reject that view, but so also (apparently) do the Justices joining the principal dissent. See *post*, at 2, 17.

V

The money-laundering charges brought against Santos were based on his payments to the lottery winners and his employees, and the money-laundering charge brought against Diaz was based on his receipt of payments as an employee. Neither type of transaction can fairly be char-

acterized as involving the lottery's profits. Indeed, the Government did not try to prove, and respondents have not admitted, that they laundered criminal profits. We accordingly affirm the judgment of the Court of Appeals.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

───────────

No. 06–1005

───────────

## UNITED STATES, PETITIONER *v.* EFRAIN SANTOS AND BENEDICTO DIAZ

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SEVENTH CIRCUIT

[June 2, 2008]

JUSTICE STEVENS, concurring in the judgment.

When Congress fails to define potentially ambiguous statutory terms, it effectively delegates to federal judges the task of filling gaps in a statute. See *Commissioner* v. *Fink*, 483 U. S. 89, 104 (1987) (STEVENS, J., dissenting) ("In the process of legislating it is inevitable that Congress will leave open spaces in the law that the courts are implicitly authorized to fill"). Congress has included definitions of the term "proceeds" in some criminal statutes,[1] but it has not done so in 18 U. S. C. §1956 (2000 ed. and Supp. V), the money laundering statute at issue in this case. That statute is somewhat unique because it applies to the proceeds of a varied and lengthy list of specified unlawful activities, see §1956(c)(7) (defining "specified unlawful activity" to include, *inter alia*, controlled substance violations, murder, bribery, smuggling, various forms of fraud, concealment of assets, various environmental offenses, and health care offenses).

Although it did not do so, it seems clear that Congress could have provided that the term "proceeds" shall have

───────────

[1] For example, 18 U. S. C. §2339C(e)(3) (2000 ed., Supp. V), which prohibits the concealment of proceeds derived from funds used to support terrorism, defines "proceeds" to mean "any funds derived from or obtained, directly or indirectly, through the commission of [the] offense."

one meaning when referring to some specified unlawful activities and a different meaning when referring to others. In fact, in the general civil forfeiture statute, §981, Congress did provide two different definitions of "proceeds," recognizing that—for a subset of activities— "proceeds" must allow for the deduction of costs. Compare §981(a)(2)(A) (2000 ed.) (defining "proceeds" in cases involving illegal goods and services to mean "property of any kind obtained directly or indirectly . . . not limited to the net gain or profit realized from the offense") with §981(a)(2)(B) (defining "proceeds" with respect to lawful goods sold in an illegal manner as the amount of money acquired "less the direct costs incurred in providing the goods or services").

We have previously recognized that the same word can have different meanings in the same statute.[2] If Congress could have expressly defined the term "proceeds" differently when applied to different specified unlawful activities, it seems to me that judges filling the gap in a statute with such a variety of applications may also do so, as long as they are conscientiously endeavoring to carry out the intent of Congress. Therefore, contrary to what JUSTICE ALITO and the plurality state, see *post*, at 17 (dissenting opinion); *ante*, at 15-16 (plurality opinion), this Court need not pick a single definition of "proceeds" applicable to every unlawful activity, no matter how incongruous some applications may be.

As JUSTICE ALITO rightly argues, the legislative history of §1956 makes it clear that Congress intended the term "proceeds" to include gross revenues from the sale of contraband and the operation of organized crime syndicates

------

[2] See, *e.g., General Dynamics Land Systems, Inc.* v. *Cline*, 540 U. S. 581, 595 (2004) (rejecting the presumption that the term "age" had an identical meaning throughout the Age Discrimination in Employment Act of 1967).

involving such sales.[3]  But that history sheds no light on
how to identify the proceeds of many other types of speci-
fied unlawful activities.  For example, one specified unlaw-
ful activity is the conduct proscribed by §541, "Entry of
goods falsely classified."   Section 541 provides that
"[w]hoever knowingly effects any entry of goods, wares, or
merchandise, at less than the true weight or measure
thereof, or upon a false classification as to quality or
value, or by the payment of less than the amount of duty
legally due, shall be . . . imprisoned not more than two
years."   Conceivably the "proceeds" stemming from a
violation of §541 could be either the money realized by
misstating the value—that is, the amount by which the
criminal "profits" by paying reduced duties—or the total
price at which the goods are later sold, even though the
misclassification had only a trivial impact on that price.

   Just as the legislative history fails to tell us how to
calculate the "proceeds" of violations of §541, it is equally
silent on the proceeds of an unlicensed stand-alone gam-
bling venture.  The consequences of applying a "gross
receipts" definition of "proceeds" to the gambling operation
conducted by respondents are so perverse that I cannot
believe they were contemplated by Congress, particularly
given the fact that nothing in JUSTICE ALITO's thorough
review of the legislative history indicates otherwise.[4]

   Constrained by a holding that the payment of expenses
constitutes "promotion,"[5] JUSTICE ALITO's opinion runs

_____

   [3]Thus, I cannot agree with the plurality that the rule of lenity must
apply to the definition of "proceeds" for these types of unlawful activities.

   [4]As JUSTICE ALITO notes, some reference was made in the legislative
history to gambling as a part of a broader criminal syndicate's activities.
*Post*, at 10.  But that reference does not indicate that Congress intended
the "proceeds" of a gambling business to include gross receipts.

   [5]The Seventh Circuit held on a prior appeal that respondent Santos'
actions were legally sufficient to convict him of promoting the carrying
on of a business under §1956, *United States* v. *Febus*, 218 F. 3d 784,
789–790 (2000).  JUSTICE ALITO criticizes the plurality for allowing the

squarely into what can be characterized as the "merger" problem.  Allowing the Government to treat the mere payment of the expense of operating an illegal gambling business as a separate offense is in practical effect tantamount to double jeopardy, which is particularly unfair in this case because the penalties for money laundering are substantially more severe than those for the underlying offense of operating a gambling business.  A money laundering conviction increases the statutory maximum from 5 to 20 years, and the Sentencing Commission has prescribed different Guidelines ranges for the two crimes.[6] When a defendant has a significant criminal history or Guidelines enhancements apply, the statutory cap of five years in §1955 is an important limitation on a defendant's sentence—a limitation that would be eviscerated if JUSTICE ALITO's definition of "proceeds" were applied in this case.

JUSTICE ALITO and JUSTICE BREYER suggest that the advisory nature of the Guidelines post-*Booker*, *United States* v. *Booker*, 543 U. S. 220 (2005), or the possibility of an amendment to the money laundering Guideline, would soften this blow, *post*, at 17-18 (opinion of ALITO, J.); *post*, at 2–3 (opinion of BREYER, J.), and indeed they could.  But

_____

interpretation of "proceeds" to be "dictated by an unreviewed interpretation of another statutory element."  See *post,* at 18.  I do not base my opinion on any disagreement with the interpretation of "promotion."

[6] For example, under the 2007 Guidelines, the base offense level for running a gambling business is 12.  United States Sentencing Commission, Guidelines Manual §2E3.1 (Nov. 2007) (USSG).  Section 2S1.1, which provides the base offense level for money laundering, adds 2 levels to the base offense level for the underlying crime where the defendant is convicted under 18 U. S. C. §1956.  This scheme for determining the base offense level first appeared in the November 2001 Sentencing Guidelines.  Prior to 2001, the difference between sentences for gambling and money laundering was even more pronounced, as USSG §2S1.1 (Nov. 2000) set an offense level of 23, which could be increased if the value of the funds exceeded $100,000.

the result in the case at hand might not be softened at all by resort to *Booker* because respondents' direct appeal was decided in 2000, several years prior to our decision in *Booker*. If JUSTICE ALITO's opinion were to carry the day, both respondents would return to prison to serve the remainder of their lengthy sentences.

The revenue generated by a gambling business that is used to pay the essential expenses of operating that business is not "proceeds" within the meaning of the money laundering statute. As the plurality notes, there is "no explanation for why Congress would have wanted a transaction that is a normal part of a crime it had duly considered and appropriately punished elsewhere in the Criminal Code, to radically increase the sentence for that crime." *Ante,* at 9. This conclusion dovetails with what common sense and the rule of lenity would require. Faced with both a lack of legislative history speaking to the definition of "proceeds" when operating a gambling business is the "specified unlawful activity" and my conviction that Congress could not have intended the perverse result that would obtain in this case under JUSTICE ALITO's opinion, the rule of lenity may weigh in the determination. And in that respect the plurality's opinion is surely persuasive.[7] Accordingly, I concur in the judgment.

———————

[7] In what can only be characterized as the "purest of dicta," the plurality speculates about the *stare decisis* effect of our judgment and interprets my conclusion as resting on the ground that "'proceeds' means 'profits' when there is no legislative history to the contrary." *Ante*, at 16. That is not correct; my conclusion rests on my conviction that Congress could not have intended the perverse result that the dissent's rule would produce if its definition of "proceeds" were applied to the operation of an unlicensed gambling business. In other applications of the statute not involving such a perverse result, I would presume that the legislative history summarized by JUSTICE ALITO reflects the intent of the enacting Congress. See *post*, at 2 and n. 1 (opinion of ALITO, J.). Its decision to leave the term undefined is consistent with my view that "proceeds" need not be given the same definition when

_____

applied to each of the numerous specified unlawful activities that
produce unclean money. *Clark* v. *Martinez*, 543 U. S. 371 (2005), poses
no barrier to this conclusion. In *Martinez* there was no compelling
reason—in stark contrast to the situation here—to believe that Con-
gress intended the result for which the Government argued.

# SUPREME COURT OF THE UNITED STATES

———————

No. 06–1005

———————

## UNITED STATES, PETITIONER *v.* EFRAIN SANTOS AND BENEDICTO DIAZ

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SEVENTH CIRCUIT

[June 2, 2008]

JUSTICE BREYER, dissenting.

I join JUSTICE ALITO's dissent while adding the following observations about what has been referred to as the "'merger problem.'" *Ante*, at 8 (plurality opinion). Like the plurality, I doubt that Congress intended the money laundering statute automatically to cover financial transactions that constitute an essential part of a different underlying crime. Operating an illegal gambling business, for example, inevitably involves investment in overhead as well as payments to employees and winning customers; a drug offense normally involves payment for drugs; and bank robbery may well require the distribution of stolen cash to confederates. If the money laundering statute applies to this kind of transaction (*i.e.*, if the transaction is automatically a "financial transaction" that "involves the proceeds of specified unlawful activity" made "with the intent to promote the carrying on of specified unlawful activity"), then the Government can seek a heavier money laundering penalty (say, 20 years), even though the only conduct at issue is conduct that warranted a lighter penalty (say, 5 years for illegal gambling). 18 U. S. C. §1956(a)(1).

It is difficult to understand why Congress would have intended the Government to possess this punishment-transforming power. Perhaps for this reason, the Tenth

Circuit has written that "Congress aimed the crime of money laundering at conduct that follows in time the underlying crime rather than to afford an alternative means of punishing the prior 'specified unlawful activity.'" *United States* v. *Edgmon*, 952 F. 2d 1206, 1214 (1991). And, in 1997, the United States Sentencing Commission told Congress that it agreed with the Department of Justice that "money laundering cannot properly be charged for 'merged' transactions that are part of the underlying crime." Report to Congress: Sentencing Policy for Money Laundering Offenses, including Comments on a Dept. of Justice Report, p. 16 (Sept. 1997), online at http://www.ussc.gov/r_congress/launder.pdf (as visited May 20, 2008, and available in Clerk of Court's case file).

Thus, like the plurality, I see a "merger" problem. But, unlike the plurality, I do not believe that we should look to the word "proceeds" for a solution. For one thing, the plurality's interpretation of that word creates the serious logical and practical difficulties that JUSTICE ALITO describes. See *post*, at 7–12 (dissenting opinion) (describing difficulties associated with proof and accounting). For another thing, there are other, more legally felicitous places to look for a solution. The Tenth Circuit, for example, has simply held that the money laundering offense and the underlying offense that generated the money to be laundered must be distinct in order to be separately punishable. *Edgmon, supra*, at 1214. Alternatively the money laundering statute's phrase "with the intent *to promote* the carrying on of specified unlawful activity" may not apply where, for example, only one instance of that underlying activity is at issue. (The Seventh Circuit on a prior appeal in this case rejected that argument, and thus we do not consider it here. See *United States* v. *Febus*, 218 F. 3d 784, 789 (2000).)

Finally, if the "merger" problem is essentially a problem of fairness in sentencing, the Sentencing Commission has

adequate authority to address it. Congress has instructed the Commission to "avoi[d] unwarranted sentencing disparities" among those "found guilty of *similar criminal conduct.*" 28 U. S. C. §991(b)(1)(B) (emphasis added); see also §994(f) (instructing the Commission to pay particular attention to those disparities). The current money laundering Guideline, United States Sentencing Commission, Guidelines Manual §2S1.1 (Nov. 2007) (USSG), by making no exception for a situation where *nothing but a single instance of the underlying crime has taken place,* would seem to create a serious and unwarranted disparity among defendants who have engaged in identical conduct. My hope is that the Commission's past efforts to tie more closely the offense level for money laundering to the offense level of the underlying crime, see *id.,* Supp. to App. C, Amdt. 634 (Nov. 2001), suggest a willingness to consider directly this kind of disparity. Such an approach could solve the "merger" problem without resort to creating complex interpretations of the statute's language. And any such solution could be applied retroactively. See 28 U. S. C. §994(u).

In light of these alternative possibilities, I dissent.

# SUPREME COURT OF THE UNITED STATES

———————

No. 06–1005

———————

## UNITED STATES, PETITIONER *v.* EFRAIN SANTOS AND BENEDICTO DIAZ

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

[June 2, 2008]

JUSTICE ALITO, with whom THE CHIEF JUSTICE, JUSTICE KENNEDY, and JUSTICE BREYER join, dissenting.

Fairly read, the term "proceeds," as used in the principal federal money laundering statute, 18 U. S. C. §1956(a), means "the total amount brought in," the primary dictionary definition. Webster's Third New International Dictionary 1807 (1976) (hereinafter Webster's 3d). See also Random House Dictionary of the English Language 1542 (2d ed. 1987) ("the total sum derived from a sale or other transaction"). The plurality opinion, however, makes no serious effort to interpret this important statutory term. Ignoring the context in which the term is used, the problems that the money laundering statute was enacted to address, and the obvious practical considerations that those responsible for drafting the statute almost certainly had in mind, that opinion is quick to pronounce the term hopelessly ambiguous and thus to invoke the rule of lenity. Concluding that "proceeds" means "profits," the plurality opinion's interpretation would frustrate Congress' intent and maim a statute that was enacted as an important defense against organized criminal enterprises.

Fortunately, JUSTICE STEVENS's opinion recognizes that the term "proceeds" "include[s] gross revenues from the sale of contraband and the operation of organized crime syndicates involving such sales." *Ante*, at 2–3 (opinion concurring in judgment).[1] I cannot agree with JUSTICE STEVENS's approach insofar as it holds that the meaning of the term "proceeds" varies depending on the nature of the illegal activity that produces the laundered funds, but at least that approach preserves the correct interpretation of the statute in most of the cases that were the focus of congressional concern when the money laundering statute was enacted.

## I
### A

While the primary definition of the term "proceeds" is "the total amount brought in," I recognize that the term may also be used to mean "net profit," Webster's 3d 1807, and I do not suggest that the question presented in this case can be answered simply by opening a dictionary. When a word has more than one meaning, the meaning that is intended is often made clear by the context in which the word is used, and thus in this case, upon finding that the term "proceeds" may mean both "the total amount brought in" and "net profit," the appropriate next step is not to abandon any effort at interpretation and summon in the rule of lenity. Rather, the next thing to do is to ask what the term "proceeds" customarily means in the context that is relevant here—a money laundering statute.

The federal money laundering statute is not the only money laundering provision that uses the term "proceeds." On the contrary, the term is a staple of money laundering

---

[1] In light of the plurality opinion's discussion of "the *stare decisis* effect of JUSTICE STEVENS' opinion," *ante*, at 16, it must be noted that five Justices agree with the position taken by JUSTICE STEVENS on the matter discussed in the preceding sentence of the text.

laws, and it is instructive that in every single one of these provisions in which the term "proceeds" is defined—and there are many—the law specifies that "proceeds" means "the total amount brought in."

The leading treaty on international money laundering, the United Nations Convention Against Transnational Organized Crime (Convention), Nov. 15, 2000, 2225 U. N. T. S. 209 (Treaty No. I–39574), which has been adopted by the United States and 146 other countries,[2] is instructive. This treaty contains a provision that is very similar to §1956(a)(1)(B)(i). Article 6.1 of the Convention obligates signatory nations to criminalize "[t]he . . . transfer of property, knowing that such property is *the proceeds of crime*, for the purpose of concealing or disguising the illicit origin of the property or of helping any person who is involved in the commission of the predicate offence to evade the legal consequences of his or her action." *Id.,* at 277 (emphasis added). The Convention defines the term "proceeds" to mean "any property derived from or obtained, directly or indirectly, through the commission of an offence." *Id.,* at 275 (Art. 2(e)). The money laundering provision of the Convention thus covers gross receipts.[3]

—————

[2] See Multilateral Treaties Deposited with the Secretary-General, pt. I, ch. XVIII, No. 12, United Nations Convention against Transnational Crime (Nov. 15, 2007), online at http://untreaty.un.org/ENGLISH/bible/englishinternetbible/partI/chapterXVIII/treaty13.asp (all Internet materials as visited May 29, 2008, and available in Clerk of Court's case file).

[3] If 18 U. S. C. §1956 were limited to profits, it would be narrower than the obligation that the United States undertook in Article 6.1 of the Convention, but the Department of State has taken the position that no new legislation is needed to bring the United States into compliance. See Hearing on Law Enforcement Treaties before the Senate Committee on Foreign Relations, 108th Cong., 2d Sess., 10 (2004) (statement of Samuel M. Witten, Deputy Legal Adviser ("[W]e can comply with the Convention's criminalization obligations without the need for new legislation")).

The term "proceeds" is given a similarly broad scope in the Model Money Laundering Act (Model Act). See President's Commission on Model State Drug Laws, Economic Remedies, §C (1993). Section 5(a)(1) of the Model Act criminalizes transactions involving property that is "the proceeds of some form of unlawful activity," and the Model Act defines "proceeds" as "property acquired or derived directly or indirectly from, produced through, realized through, or caused by an act or omission . . . includ[ing] any property of any kind," §4(a).

Fourteen States have money laundering statutes that define the term "proceeds," and in every one of these laws the term is defined in a way that encompasses gross receipts. See Ariz. Rev. Stat. Ann. §§13–2314(N)(3) (West 2001), 13–2317(F)(4)(b) (West Supp. 2007); Ark. Code Ann. §5–42–203(5) (2006); Cal. Health & Safety Code Ann. §11370.9(h)(1) (West 2007); Haw. Rev. Stat. §§708A–2, 708A–3 (2007); Ind. Code §§35–45–15–4, 35–45–15–5 (West 2004); Iowa Code §§706B.1(1), 706B.2 (2005); La. Stat. Ann. §14:230(A)(4) (West 2004); Mich. Comp. Laws Ann. §§750.411j(f), 750.411j (West 2004); N. M. Stat. Ann. §§30–51–2(E), 30–51–4(A) (2004); Ohio Rev. Code Ann. §§1315.51(H), 1315.55 (Lexis 2006); Tex. Penal Code §§34.01(4), 34.02 (West Supp. 2007); Utah Code Ann. §§76–10–1902(9), 76–10–1903 (West 2007); Va. Code Ann. §§18.2–246.2, 18.2–246.3 (Lexis 2004); Wash. Rev. Code §§9A.83.010(5), 9A.83.020 (2006). Cf. N. J. Stat. Ann. §2C:21–25(d) (West 2005).[4]

_____

[4] Connecticut, the only State with a money laundering statute that does not use the term "proceeds," uses equivalent language that is not limited to profits. See Conn. Gen. Stat. §53a–276 (2005) ("A person is guilty for money laundering in the first degree when he exchanges . . . one or more monetary instruments derived from criminal conduct constituting a felony"). I have found no money laundering statute that defines "proceeds" to mean profits or that uses other language that limits the law's reach to profits or net income.

This pattern of usage is revealing. It strongly suggests that when lawmakers, knowledgeable about the nature and problem of money laundering, use the term "proceeds" in a money laundering provision, they customarily mean for the term to reach all receipts and not just profits.[5]

### B

There is a very good reason for this uniform pattern of usage. Money laundering provisions serve two chief ends. First, they provide deterrence by preventing drug traffickers and other criminals who amass large quantities of cash

_____

The only state money laundering statute the even uses the term "profits," "net income," or something similar is that of Arkansas, which plainly defines "criminal proceeds" to include all gross receipts of criminal conduct: "'Criminal proceeds' means: (A) Anything of value furnished or intended to be furnished in exchange for criminal conduct or contraband received in violation of state or federal law; and (B) Property or profits traceable to" such an exchange. Ark. Code Ann. §5–42–203(5) (2006).

[5] The version of the money laundering statute originally passed by the House reflected a similar legislative judgment. The bill made it a crime to engage in financial transactions and certain commercial transactions involving "criminally derived property that is derived from a designated offense." H. R. 5484, 99th Cong., 2d Sess., §602, p. 154 (1986) (as introduced). The term "criminally derived property" is naturally understood to include all property that is "receive[d]" or "obtain[ed]" as a result of criminal activity, see Webster's 3d 609; Random House Dictionary of the English Language 389 (1967), and thus to include all gross receipts and not just profit. The House bill defined the term "criminally derived property" to mean "any property constituting, or derived from, *proceeds* obtained from a criminal offense." H. R. 5484, §602, at 158 (emphasis added). Accordingly, the House seems to have understood "proceeds" to include gross receipts.

The bill passed by the Senate, like the current money laundering statute, simply used the term "proceeds," S. 2683, 99th Cong., 2d Sess., §2(a) (1986), and the House acceded to the Senate version. See H. R. 5484, 99th Cong., 2d Sess., §1352, p. 48 (1986) (as enacted). There is no suggestion in the legislative history that the term "criminally derived property" and the term "proceeds" were perceived as having different meanings.

from using these funds "to support a luxurious lifestyle" or otherwise to enjoy the fruits of their crimes. Model Act, Policy Statement, p. C–105. See President's Commission on Organized Crime, Interim Report to President and Attorney General, The Cash Connection: Organized Crime, Financial Institutions, and Money Laundering 7–8 (Oct. 1984) (hereinafter Interim Report); Aranson, Bouker, & Hannon, Money Laundering, 31 Am. Crim. L. Rev. 721, 721–722 (1994); H. R. Rep. No. 99–746, p. 16 (1986) (hereinafter H. R. Rep.). Second, they inhibit the growth of criminal enterprises by preventing the use of dirty money to promote the enterprise's growth. See, *e.g.,* 18 U. S. C. §§1956(a)(1)(A)(i), (a)(2)(A), and (a)(3)(A); Model Act §§5(a)(2), (4); N. J. Stat. Ann. §2C:21–25(b)(1); Tex. Penal Code §§34.02(a)(3)–(4).

Both of these objectives are frustrated if a money laundering statute is limited to profits. Dirty money may be used to support "a luxurious lifestyle" and to grow an illegal enterprise whenever the enterprise possesses large amounts of illegally obtained cash. And illegal enterprises may acquire such cash while engaging in unlawful activity that is unprofitable.

Suppose, for example, that a drug cartel sends a large shipment of drugs to this country, a good part of the shipment is intercepted, the remainder is sold, the cartel ends up with a net loss but with a large quantity of cash on its hands, and the cartel uses the cash in financial transactions that are designed to conceal the source of the cash or to promote further crime. There is no plausible reason why Congress would not have wanted the money laundering statute to apply to these financial transactions. If the cartel leaders use the money to live in luxury, this provides an incentive for these individuals to stay in the business and for others to enter. If the cartel uses the money to finance future drug shipments or to expand the business, public safety is harmed.

It is certainly true that Congress, in enacting the federal money laundering statute, was primarily concerned about criminal enterprises that realize profits. A criminal operation that consistently loses money will not last very long and thus presents a lesser danger than a profitable operation. But narrowing a money laundering statute so that it reaches only profits produces two perverse results that Congress cannot have wanted. First, it immunizes successful criminal enterprises during those periods when they are operating temporarily in the red. Second, and more important, it introduces pointless and difficult problems of proof. Because the dangers presented by money laundering are present whenever criminals have large stores of illegally derived funds on their hands, there is little reason to require proof—which may be harder to assemble than the plurality opinion acknowledges—that the funds represent profits.

## C

The implausibility of a net income interpretation is highlighted in cases involving professionals and others who are hired to launder money. Those who are knowledgeable about money laundering stress the importance of prosecuting these hired money launderers. See, *e.g.,* Depts. of Treasury and Justice, The 2001 National Money Laundering Strategy, pp. ix–x, 1–2 (Sept. 2001), online at http://www.treas.gov/press/releases/docs/ml2001.pdf; Financial Action Task Force on Money Laundering, 1996–1997 Report on Money Laundering Typologies 7 (Feb. 1997), online at http://www.fatf-gafi.org/dataoecd/31/29/34043795.pdf; Butterworths International Guide to Money Laundering Law and Practice 629 (T. Graham 2d ed. 2003); Ratliff, Third Party Money Laundering: Problems of Proof and Prosecutorial Discretion, 7 Stan. L. & Policy Rev. 173 (1996); Sultzer, Money Laundering: The Scope of the Problem and Attempts to Combat It, 63 Tenn. L. Rev.

143, 147–148 (1995); H. R. Rep., at 16–17.

A net income interpretation would risk hamstringing such prosecutions. To violate 18 U. S. C. §1956(a), a defendant must "kno[w] the property involved in a financial transaction represents the proceeds of some form of unlawful activity." A professional money launderer is not likely to know (or perhaps even to care) whether the enterprise is operating in the black when the funds in question were acquired. Therefore, under a net income interpretation, financial specialists and others who are hired to launder funds would generally be beyond the reach of the statute, something that Congress almost certainly did not intend.

It is revealing that the money laundering statute explicitly provides that a money launderer need only know that "the property involved in the transaction represented proceeds from some form, though not necessarily which form, of [specified illegal] activity." §1956(c)(1). Thus, the prosecution is not required to prove that a hired money launderer knew that funds provided for laundering derived from, say, drug sales as opposed to gambling. There is no reason to think that hired money launderers are more likely to know whether funds include profits than they are to know the nature of the illegal activity from which the funds were derived. Consequently, §1956(c) suggests that Congress did not intend to require proof that a hired money launderer knew that funds provided for laundering included profits.

The plurality opinion dismisses these concerns with the observation that a jury may infer that a hired launderer knew that funds included profits if the launderer had a long-running relationship with the entity or person providing the funds or knew that the entity or person had been involved in the illegal enterprise for a lengthy period. See *ante*, at 14. But what about the case where the launderer accepts a million dollars of drug money on a single occa-

sion? And even if there would be legally sufficient evidence to support an inference of the requisite knowledge under the circumstances that the plurality opinion posits, the requirement of convincing a jury to find beyond a reasonable doubt that the funds included profits would pose a troublesome and (in light of the aim of the money laundering statute) pointless obstacle.

### D

Even in cases in which the defendants are alleged to have been involved in the underlying criminal activity, a net income interpretation would produce nettlesome problems that Congress cannot have wanted. These problems may be especially acute in the very cases that money laundering statutes principally target, that is, cases involving large-scale criminal operations that continue over a substantial period of time, particularly drug cartels and other organized crime syndicates.

The federal money laundering statute was enacted in the wake of an influential report by the President's Commission on Organized Crime that focused squarely on criminal enterprises of this type. See Interim Report 7–8 (described in S. Rep. No. 99–433, pp. 2–4 (1986) (hereinafter S. Rep.) and H. R. Rep., at 16). The Commission identified drug traffickers and other organized criminal groups as presenting the most serious problems. See Interim Report 7. The Commission found that "narcotics traffickers, who must conceal billions of dollars in cash from detection by the government, create by far the greatest demand for money laundering services" but that "numerous other types of activities typical of organized crime, such as loansharking and gambling, also create an appreciable demand for such schemes." *Ibid.* To illustrate the scope and nature of the money laundering problem, a section of the Interim Report was devoted to case studies, most of which involved the laundering of drug money. *Id.,*

at 29–49.

As a prime example of the problem of money laundering, the report discussed the so-called "Pizza Connection" case that was prosecuted in federal court in New York City in the 1980's. In that case, the evidence showed that the Sicilian Mafia and organized crime elements in the United States, over a period of many years, imported huge amounts of heroin into this country, sold the heroin here, accumulated millions of dollars of cash, and then laundered the funds by smuggling them overseas in suitcases or funneling the money through a maze of bank accounts. See *id.,* at 31–35; *United States* v. *Casamento*, 887 F. 2d 1141, 1148–1149 (CA2 1989).

Following the issuance of the Interim Report, Congress turned its attention to the problem of money laundering, and much of the discussion focused on the need to prevent laundering by drug and organized crime syndicates. See*, e.g.,* S. Rep., at 3 (discussing "organized crime 'businesses' such as gambling, prostitution, and loansharking"), 4 ("Money laundering is a crucial financial underpinning of organized crime and narcotics trafficking" (internal quotation marks omitted)); Hearing on Money Laundering Legislation before the Senate Committee on the Judiciary, 99th Cong., 1st Sess., 1 (1985) (statement of Chairman Thurmond); *id.,* at 29 (statement of Sen. Biden), 30 (statement of Sen. DeConcini), 31 (statement of Sen. D'Amato), 53 (statement of Assistant Attorney General Trott).

In light of these concerns, it is most unlikely that Congress meant to enact a money laundering statute that would present daunting obstacles in the very sort of cases that had been identified as presenting the most pressing problems, that is, cases, like the "Pizza Connection" case, in which law enforcement intercepts cash or wire transfers of funds derived from drug sales or other unlawful activity that occurred over a period of time. The plurality opinion's interpretation of the term "proceeds," however, would

often produce such problems. Tracing funds back to particular drug sales and proving that these sales were profitable will often prove impossible. See *United States* v. *Bajakajian*, 524 U. S. 321, 351–352 (1998) (KENNEDY, J., dissenting). Indeed, it will often be hard even to establish with any precision the period of time during which the drug sales occurred. But assuming that the Government can prove roughly when the funds were acquired, the next hurdle would be to show that the drug ring had net income during the time when the funds were acquired.

"Net income" means "[t]he excess of revenues over all related expenses for a given period." R. Estes, Dictionary of Accounting 88 (1981) (emphasis deleted). There are no generally accepted accounting principles for determining the net income of illegal enterprises, and therefore, in order to apply a net income interpretation, special accounting rules would have to be developed.

In the drug-money cases that I have been discussing, the courts would have to decide whether the drug syndicate's net income should be calculated on an annual, quarterly, or some other basis. In addition, the courts would be forced to devise rules for determining the scope of the enterprise for which the net income calculation must be performed. Suppose, for example, that there were connections of an uncertain nature or degree between drug operations in different cities or countries. Rules would be needed to determine whether affiliated criminal groups should be regarded as one enterprise or several. And proof regarding the connections between such operations would often be very difficult to obtain. Criminal enterprises do not have papers of incorporation, partnership agreements, or (in most instances) other documents establishing precise business relationships.

Rules would also be needed in order to determine whether particular illegal expenditures should be considered as expenses. In the "Pizza Connection" case, the

Sicilian Mafia used its income for such things as the mur-
der of magistrates, police officers, witnesses, and rivals.
See*, e.g., Casamento*, *supra*, at 1154–1156; *United States*
v. *Gambino*, 809 F. Supp. 1061, 1065–1068 (SDNY 1992).
Are these expenditures simply a cost of engaging in the
drug trade?  Are they business expenses?

  If a net income interpretation were taken to its logical
conclusion, it presumably would be necessary as well to
work out rules for the depreciation of instrumentalities of
crime that must occasionally be replaced due to the efforts
of law enforcement.  But it seems quite implausible that
Congress wanted courts or juries in money laundering
cases to grapple with questions such as the useful life of,
say, a drug processing plant or laboratory or the airplanes
and boats that are used to smuggle drugs.  And assuming
that the accounting issues can ultimately be resolved by
the courts, there would remain serious problems of proof.
Illegal enterprises generally do not keep books and records
like legitimate businesses do.

  It is tempting to dismiss many of the problems noted
above on the ground that "everyone knows" that drug
cartels, organized crime syndicates, and the like make a
profit.  But such groups may not operate in the black at all
times, and in any event, if net income is an element of the
money laundering offense, the prosecution must prove net
income beyond a reasonable doubt.  The prosecution can-
not simply ask the jury to take notice of the fact that these
groups are profitable.

  My point in citing the accounting and proof problems
that would be produced by a net income interpretation is
not that the "'receipts'" interpretation is preferable be-
cause "it is easier to prosecute," *ante*, at 11 (plurality
opinion), but that creating these obstacles would serve no
discernible purpose.  Even if a drug or gambling ring was
temporarily operating in the red during a particular pe-
riod, the laundering of money acquired during that time

would present the same dangers as the laundering of money acquired during times of profit. It is therefore implausible that Congress wanted to throw up such pointless obstacles.

The plurality opinion attempts to minimize all these problems by stating that "to establish the proceeds element under the 'profits' interpretation, the prosecution needs to show only that a single instance of specified unlawful activity was profitable and gave rise to the money involved in a charged transaction." *Ante*, at 12. This suggestion ignores both the language of the money laundering statute, which makes no reference to an "instance" of unlawful activity, and the realities of money laundering prosecutions. The prototypical money laundering case is not a case in which a defendant engages in a single, discrete criminal act and then launders the money derived from that act—for example, a case in which a "felon . . . uses . . . stolen money to pay for the rented getaway car." *Ante*, at 8. Rather, the prototypical case involves numerous criminal acts that occur over a period of time and the accumulation of funds from all these acts prior to laundering—for example, the organized crime syndicate or drug cartel that amasses large sums before engaging in a laundering transaction.

Take, for example, a case in which a defendant is charged with doing what was done in the "Pizza Connection" case—transferring millions of dollars of drug money overseas, knowing that the funds represent the proceeds of drug trafficking ("some form of unlawful activity") and that the transfer was designed to conceal the origin of the funds. See 18 U. S. C. §1956(a)(2)(B)(2). In such a case, it is unrealistic to think that individual dollars can be traced back to individual drug sales—or that Congress wanted to require such tracing.

Although the plurality opinion begins by touting the "single instance" theory as a cure for the accounting and

proof problems that a "profits" interpretation produces, the plurality's application of the "single instance" theory to the case at hand shows that this theory will not work. In this case, the "unlawful activity" that produced the funds at issue in the substantive money laundering counts was the operation of the Santos lottery,[6] and it is hardly apparent what constitutes a "single instance" of running a gambling business. Did each lottery drawing represent a separate "instance"? Each wager? And how long does each gambling "instance" last? A day? A week? A month?

When the plurality opinion addresses these questions, it turns out that "a single instance" means all instances that are charged, *i.e.*, it means that the Government had to show that receipts exceeded costs during the time the defendant allegedly conducted, financed, etc., the gambling operation. See *ante*, at 13, n. 7. Here, since the Indictment alleged that the Santos lottery continued for more than 6 years ("[b]egining in or about January 1989 and continuing to in or about December 1994, the exact dates being unknown to the Grand Jury"),[7] the plurality would apparently compel the Government to prove that the lottery was profitable over this entire period.

If this is where the "single instance" theory leads, the theory plainly does not solve the accounting and proof problems we have noted. And the plurality's suggestion that the Government had to show that the gambling operation was profitable for this entire period leads to preposterous results. Suppose that the lottery was profitable for the first five years and, at the end of each year, respondents laundered funds derived from the business. Suppose that in the sixth year the business incurred heavy losses—losses so heavy that they wiped out all of

---

[6] See Indictment in *United States* v. *Alameda,* No. 2:96 CR–044 RL (ND Ind., May 10, 1996), pp. 3, 14–25 (hereinafter Indictment).

[7] See *id.*, at 3.

the profits from the first five years. According to the plurality, if respondents were found to have operated the lottery during the entire 6-year period, then the financial transactions that occurred at the end of years one, two, three, four, and five would not violate the money laundering statute, even though an accounting done at those times would have come to the conclusion that the funds included profits. That result makes no sense.

Whenever a money laundering indictment charges that the laundered funds derived from an "unlawful activity" that comprehends numerous acts that occurred over a considerable period of time—and that is precisely the situation in many of the types of cases that the money laundering statute principally targeted—the plurality opinion's interpretation will produce difficulties. I have already discussed drug and gambling cases, and similar problems will arise in cases in which the unlawful activity is a form of fraud. For example, the unlawful activity in mail fraud (18 U. S. C. §1341) is the scheme to defraud, not the individual mailings carried out in furtherance of the scheme. See *Neder* v. *United States*, 527 U. S. 1, 19 (1999); *United States* v. *Mankarious*, 151 F. 3d 694 (CA7 1998). In such a case, what will constitute the "single instance of unlawful activity"? Will each mailing be a separate "instance"? The same problem arises with other fraud predicates, including wire fraud (§1343), see*, e.g.*, *United States* v. *Zvi*, 168 F. 3d 49 (CA2 1999), and financial institution fraud (§1344), see, *e.g., United States* v. *Farr,* 69 F. 3d 545 (CA9 1995).

The plurality opinion suggests that the application of a profits interpretation will be easy in cases in which the financial transactions are payments of "expenses." *Ante*, at 9. But it may be no small matter to determine whether particular payments are for "expenses." When the manager of a gambling operation distributes cash to those who work in the operation, the manager may be paying them

the rough equivalent of a salary; that is, the recipients may expect to receive a certain amount for their services whether or not the operation is profitable. On the other hand, those who work in the operation may have the expectation of receiving a certain percentage of the gross revenue (perhaps even in addition to a salary), in which case their distribution may include profits. Such was the case in Santos' lottery, where the runners were paid a percentage of gross revenue. See Indictment 5; 16 Tr. 1399 (Oct. 9, 1997).

The plurality opinion cites 18 U. S. C. §1963(a) and 21 U. S. C. §853(a), for the proposition that Congress has "elsewhere" imposed the burden of proving that illegally obtained funds represent profits, but the plurality opinion's examples are inapposite. *Ante*, at 12. Neither of these provisions, however, requires a determination of net income. Both provisions permit a fine in the amount of "not more than twice the gross profits or other proceeds." 18 U. S. C. §1963(a). Thus, the term "proceeds" as used in these provisions is not limited to profits.[8]

For all these reasons, I am convinced that the term

―――――――――

[8] In 18 U. S. C. §981(a)(2)(B), which is a forfeiture provision of limited scope, Congress defines the term "proceeds" to mean net income. However, that definition applies only "[i]n cases involving lawful goods or lawful services that are sold or provided in an illegal manner." Calculating net income in that situation is easier than it would be in most money laundering cases, and it is noteworthy that Congress took care to provide rules and procedures to be used in making the calculation. See *ibid.* If Congress had intended to require proof of net income in money laundering cases, it is likely that Congress likewise would have specified the rules and procedures to be used. It is noteworthy that subparagraph (A) of §981(a)(2), which the plurality opinion does not mention, provides that in cases that are more analogous to the typical money laundering case, *i.e.*, "cases involving illegal goods [or] illegal services," the term "proceeds" "means [any] property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense."

"proceeds" in the money laundering statute means gross receipts, not net income. And contrary to the approach taken by JUSTICE STEVENS, I do not see how the meaning of the term "proceeds" can vary depending on the nature of the illegal activity that produced the laundered funds.

## II
## A

It is apparent that a chief reason for interpreting the term "proceeds" to mean net income in all money laundering cases (the approach taken in the plurality opinion) or in some money laundering cases (the approach taken by JUSTICE STEVENS) is the desire to avoid a "merger" problem in gambling cases—that is, to avoid an interpretation that would mean that every violation of §1955 (conducting an illegal gambling business) would also constitute a violation of the money laundering statute, which carries a much higher maximum penalty (20 as opposed to 5 years' imprisonment). This concern is misplaced and provides no justification for hobbling a statute that applies to more than 250 predicate offenses and not just running an illegal gambling business.

First, the so-called merger problem is fundamentally a sentencing problem, and the proper remedy is a sentencing remedy. While it is true that the money laundering statute has a higher maximum sentence than the gambling business statute, neither statute has a mandatory minimum. Thus, these statutes do not require a judge to increase a defendant's sentence simply because the defendant was convicted of money laundering as well as running a gambling business. When the respondents were convicted, their money laundering convictions resulted in higher sentences only because of the money laundering Sentencing Guideline, United States Sentencing Commission, Guidelines Manual §2S1.1 (Nov. 1997) (USSG),

which, in the pre-*Booker*[9] era, was mandatory. I agree with JUSTICE BREYER, *ante*, at 2–3 (dissenting opinion), that if a defendant is convicted of money laundering for doing no more than is required for a violation of 18 U. S. C. §1955, the defendant's sentence should be no higher than it would have been if the defendant had violated only that latter provision. Insofar as the Guidelines previously required—and now advise in favor of—a stiffer sentence, the obvious remedy is an amendment of the money laundering Guideline. And of course, now that the Guidelines are no longer mandatory, a sentencing judge could impose the sentence called for by the Guideline that applies to the gambling business provision, see USSG §2E3.1(a)(1) (Nov. 2007), or an entirely different sentence.

Second, the merger problem that the plurality opinion and JUSTICE STEVENS seek to avoid assumes the correctness of the interpretation of the promotion prong of the money laundering statute that the Seventh Circuit adopted in Santos' direct appeal, *i.e.*, that a defendant "promotes" an illegal gambling business by doing those things, such as paying employees and winning bettors, that are needed merely to keep the business running. As Santos' brief puts it, the merger problem arises when the interpretation of "proceeds" as gross receipts is "[c]ombined with the Government's broad application of the 'promotion' prong of the money laundering statute." Brief for Respondent 6. But the meaning of the element of promotion is not before us in this case, and it would not make sense to allow our interpretation of "proceeds" to be dictated by an unreviewed interpretation of another statutory element.

Third, even if there is a merger problem, it occurs in only a subset of money laundering cases. The money laundering statute reaches financial transactions that are

———————
[9] *United States* v. *Booker*, 543 U. S. 220 (2005).

intended to promote more than 250 other crimes, *ante*, at 9 (plurality opinion), as well as transactions that are intended to conceal or disguise the nature, location, source, ownership, or control of illegally obtained funds. See 18 U. S. C. §1956(a). The meaning of the term "proceeds" cannot vary from one money laundering case to the next, and the plurality opinion and JUSTICE STEVENS inappropriately allow the interpretation of that term to be controlled by a problem that may arise in only a subset of cases.

B

The plurality opinion defends its interpretation by invoking the rule of lenity, but the rule of lenity does not require us to put aside the usual tools of statutory interpretation or to adopt the narrowest possible dictionary definition of the terms in a criminal statute. On the contrary, "[b]ecause the meaning of language is inherently contextual, we have declined to deem a statute 'ambiguous' for purposes of lenity merely because it was *possible* to articulate a construction more narrow than that urged by the Government." *Moskal* v. *United States*, 498 U. S. 103, 108 (1990) (citing *McElroy* v. *United States*, 455 U. S. 642, 657–658 (1982)). As I have explained above, the meaning of "proceeds" in the money laundering statute emerges with reasonable clarity when the term is viewed in context, making the rule of lenity inapplicable.

\*   \*   \*

For these reasons, I would reverse the decision of the Court of Appeals, and I therefore respectfully dissent.